MARIAM QASIM,

        **Plaintiff,**

**v.**                                     **CIVIL ACTION NO. _____**

**MAGNUS ENTERPRISES, INC.**
**d/b/a Carson City Chevrolet**
SERVE: Paracorp Incorporated, Reg. Agent
      176 Mine Lake Ct #100
      Raleigh, NC 27615

        **Defendant.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, MARIAM QASIM ("Plaintiff" or "Ms. Qasim"), by and through her undersigned counsel, and alleges the following against Defendant MAGNUS ENTERPRISES, INC. d/b/a Carson City Chevrolet ("Magnus Enterprises").

### PRELIMINARY STATEMENT

1.     This is an action for statutory, actual, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.     Plaintiff is the victim of what is now a common crime: identity theft. A fraudster used Plaintiff's personal information to open a General Motors Financial Company, Inc. ("GM Financial") automobile loan and purchase a vehicle through Magnus Enterprises.

3.     To "purchase" the vehicle, the fraudster presented Magnus Enterprises with "proof" of identification, which was blatantly false. Instead of applying the careful scrutiny that one would expect from a dealership selling a vehicle through entirely remote transactions, Magnus

Enterprises recklessly accepted the fraudster's "proof" and used the false information presented to wrongfully obtain and use Plaintiff's consumer reports in violation of 15 U.S.C. 1681b(f).

4.      Not only did Magnus Enterprises access Plaintiff's credit reports without permission, but it also transmitted Plaintiff's private information to at least one additional third party, GM Financial, for the purpose of financing the fraudulent auto loan.

5.      Plaintiff has since spent the last two years attempting to reclaim her good name and fix the cascade of harm done to her credit after Magnus Enterprises violated Plaintiff's right to privacy and used Plaintiff's personal credit file to open an account for a criminal.

## JURISDICTION AND VENUE

8.      The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p and 28 U.S.C. §§ 1331 & 1367.

9.      Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial portion of the events giving rise to this Complaint occurred in this District and Division and the Defendant resides within this District and Division.

## PARTIES

10.      Plaintiff is a natural person and "consumer" as defined by § 1681a(c).

11.      Magnus Enterprises, Inc. d/b/a Carson City Chevrolet ("Magnus Enterprises") is corporation with its principal address located at 914 E 4th Avenue, Red Springs, NC 28377 and its registered agent, Paracorp Incorporated, located at 176 Mine Lake Ct #100, Raleigh, NC 27615.

## FACTUAL ALLEGATIONS

*Plaintiff Discovers a Fraudulent GM Financial Account that Does Not Belong to Her on Her Equifax, Trans Union, and Experian Reports*

12.      Plaintiff is a victim of identity theft.

13.     In or around September of 2023, an identity thief used Plaintiff's personal information, without Plaintiff's permission, to open numerous fraudulent accounts in Plaintiff's name.

14.     One of the fraudulent accounts opened in Plaintiff's name was an auto loan with GM Financial (the "Fraudulent GM Loan").

15.     A fraudster had "purchased" a vehicle from Magnus Enterprises and financed it in Plaintiff's name through GM Financial.

16.     Plaintiff never opened the Fraudulent GM Loan, nor did she authorize anyone to open the Fraudulent GM Loan on her behalf.

17.     The identity thief used Plaintiff's previous address, which was in Charlotte, NC, as the address associated with the Fraudulent GM Loan.

18.     The Fraudulent GM Loan also listed a co-signer with a Charlotte, NC address and a mailing address in Charlotte, NC.

19.     On or around October 18, 2023, Plaintiff filed an Identity Theft Report with the Federal Trade Commission regarding the identity theft. Plaintiff included information about the Fraudulent Auto Loan.

20.     On or around October 18, 2023, Plaintiff filed a police report with the Charlotte-Mecklenburg Police Department regarding the identity theft.

21.     At the time of the identity theft, Plaintiff was living and working in The Netherlands and had no use for a car in the United States.

22.     But for Magnus Enterprises submitting Plaintiff's personal information to GM Financial, the fraudulent auto loan with GM Financial would not have been created.

23.    But for Magnus Enterprises facilitating the creation of the fraudulent auto loan with GM Financial, GM Financial would never have reported the loan on Plaintiff's credit.

24.    On or around October 19, 2023, Plaintiff obtained a copy of her credit file with Equifax and learned about hard inquiries on her report she did not authorize, including inquiries from GM Financial.

25.    On or about October 20, 2023, Plaintiff obtained a copy of her credit file with Experian and learned that the Fraudulent GM Loan was reporting on her Experian credit report, which misrepresented to Plaintiff's potential creditors that she had more than $22,500 in liability that Plaintiff did not actually owe.

26.    On or about October 20, 2023, Plaintiff obtained a copy of her credit file with Trans Union and learned that the Fraudulent GM Loan was reporting on her Trans Union credit report, which misrepresented to Plaintiff's potential creditors that she had more than $22,500 in liability that Plaintiff did not actually owe.

27.    Shortly after learning of the fraud, Plaintiff froze her credit files with Equifax, Experian, and Trans Union (the "CRAs") in an attempt to prevent further fraud from occurring.

28.    In or around October 2023, Plaintiff attempted to dispute the inaccurate information with the CRAs via their respective websites.

29.    Upon information and belief, in or around October 2023, Plaintiff was unable to dispute the fraudulent information on her Equifax and Trans Union reports because both Equifax and Trans Union required Plaintiff to prove her identity in ways that she was not able to do as a United States Citizen living abroad (e.g., by providing a US-based phone number).

30.     Upon information and belief, in or around October 2023, Plaintiff disputed the Fraudulent GM Loan with Experian. Plaintiff also disputed the fraudulent inquiries on her Experian report.

31.     On or around October 23, 2023, Experian informed Plaintiff that it had removed several of the disputed inquiries. Experian also provided Plaintiff with a copy of her Experian file which showed the Fraudulent GM Loan as "UNDER DISPUTE".

32.     On or around October 24, 2023, GM Financial sent a letter to Plaintiff acknowledging that Plaintiff had informed GM Financial that the account was opened as a result of identity theft.

33.     On or around October 25, 2023, Plaintiff updated her report with the Charlotte-Mecklenburg Police Department to include new information she had learned about the identity theft.

34.     In or around January 2024, Plaintiff mailed written dispute letters to the CRAs.

35.     In her January 2024 dispute letter to Equifax, Plaintiff disputed Equifax's inaccurate reporting of the Fraudulent GM Account and several fraudulent inquiries from September of 2023, including inquiries from GM Financial. Plaintiff signed the letter as a declaration under penalty of perjury, pursuant to 28 U.S.C. § 1746, and she included a copy of her passport and social security card with the letter so it would be clear that Plaintiff legitimately sent the dispute.

36.     In her January 2024 dispute letter to Experian, Plaintiff disputed Experian's inaccurate reporting of the Fraudulent GM Account. Plaintiff signed the letter as a declaration under penalty of perjury, pursuant to 28 U.S.C. § 1746, and she included a copy of her passport

and social security card with the letter so it would be clear that Plaintiff legitimately sent the dispute.

37.     In her January 2024 dispute letter to Trans Union, Plaintiff disputed Trans Union's inaccurate reporting of the Fraudulent GM Account. Plaintiff signed the letter as a declaration under penalty of perjury, pursuant to 28 U.S.C. § 1746, and she included a copy of her passport and social security card with the letter so it would be clear that Plaintiff legitimately sent the dispute.

38.     Plaintiff did not receive dispute results from the CRAs in response to her January 2024 disputes.

39.     Sometime after sending the January 2024 dispute letters, Plaintiff attempted to obtain copies of her credit files from the CRAs via www.AnnualCreditReport.com.

40.     Plaintiff was not able to obtain copies of her credit files from www.AnnualCreditReport.com because, upon information and belief, the CRAs require consumers to input a US-based telephone number to obtain copies of credit files from that site pursuant to 15 U.S.C. § 1681g.

41.     Subsequently, Plaintiff began paying a third-party company, FICO, to obtain information about what was reporting on her credit.

42.     On or around May 15, 2024, Plaintiff obtained a "tri-merge" report from FICO and discovered that Equifax was still reporting the Fraudulent GM Account on Plaintiff's credit.

43.     In or around July 2024, Plaintiff mailed written another written dispute letter to Equifax via USPS first class certified mail, return receipt requested. Because Plaintiff knew that Equifax would only accept a dispute from her if it was associated with a United States address, Plaintiff used her aunt's address in New Jersey as the return address.

44. In her July 2024 dispute letter to Equifax, Plaintiff disputed, among other things, Equifax's inaccurate reporting of the Fraudulent GM Account, an inaccurate address, and several inquiries that were on her Equifax report as a result of fraud (including inquiries with GM Financial). Plaintiff signed the letter as a declaration under penalty of perjury, pursuant to 28 U.S.C. § 1746, and she included a copy of her passport and social security card with the letter so Equifax would know that Plaintiff legitimately sent the dispute.

45. On or around July 28, 2024, Equifax sent Plaintiff a letter requesting certain specific proof of her identity, which Plaintiff was unable to provide due to temporarily living overseas.

46. After GM Financial failed to conduct the detailed and searching reinvestigation required of it under *Johnson v. MBNA*, 357 F.3d 426 (4th Cir. 2004), Equifax "parroted" the information dictated to them by GM Financial.

47. Upon information and belief, the CRAs prepared and published to third parties multiple, inaccurate consumer reports about Plaintiff that reflected the inaccurate and fraudulent GM Financial account.

48. In addition to disputing GM Financial's reporting with the CRAs, Plaintiff directly disputed her responsibility for the fraudulent account with GM Financial.

49. Upon information and belief, the Fraudulent GM Account was deleted from Plaintiff's credit files after her repeated disputes.

### *Magnus Enterprises Obtained and Used Plaintiff's Consumer Report(s) Without a Permissible Purpose*

50. "Congress passed the Fair Credit Reporting Act (FCRA) in response to concerns about data brokers assembling detailed dossiers about consumers and selling this information to those making employment, credit, and other decisions. People often have little choice about whether to enter into business relationships with these companies or whether they will be tracked,

yet the data these companies collect may nevertheless play a decisive role in significant life decisions, like buying a home or finding a job. The FCRA provides a range of protections, including accuracy standards, dispute rights, and restrictions on how data can be used. The law covers data brokers like credit reporting companies and background screening firms, as well as those who report information to these firms." *CFPB launches inquiry into the business practices of Data Broker*s (2023) Consumer Financial Protection Bureau. Available at: https://www.consumerfinance.gov/about-us/newsroom/cfpb-launches-inquiry-into-the-business-practices-of-data-brokers/ (Accessed: 09 May 2023).

51.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan)." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001).

52.     As the FCRA sets forth, a consumer report is:

Any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d).

53.     Accessing consumer reports is presumptively illegal. To overcome this presumption, a party seeking to access consumer reports must have a permissible purpose for doing so and must certify to the agency from which it seeks reports the FCRA purpose for which it will use the reports and that it will use the reports for no other purpose. 15 U.S.C. § 1681b(f).

54.     One such permissible purpose that arises in the credit realm is for reports to issue "[t]o a person which [the reporting agency] has reason to believe—A intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

55.     Likewise, Courts have long held that reports issued to a user involving an extension of credit or for collection purposes as to credit fall within the coverage of § 1681b(a)(3)(A). *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) ("the statute expressly permits distribution of a consumer report to an entity that 'intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer.'"); *Korotki v. Thomas, Ronald & Cooper, P.A.*, 131 F.3d 135 (4th Cir. 1997) (Defendant "was seeking to collect an account owed by the consumer, § 1681(b)(3)(A), likewise a permissible purpose"); *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 188 (D.N.J. 2012) ("Capital One could rightfully obtain a copy of Plaintiff's consumer report from a CRA in order to review, or collect upon, Plaintiff's MasterCard credit card account.").

56.     Apart from 15 U.S.C. § 1681b(a)(3)(A), no other permissible purpose could conceivably allow Magnus Enterprises to access Plaintiff's consumer report(s).

57.     Magnus Enterprises first accessed Plaintiff's credit file in or around September 1, 2023 in connection with the issuance of the Fraudulent GM Loan. The information Magnus Enterprises received purportedly authorizing it to access Plaintiff's consumer report(s) bore multiple hallmarks of identity theft. Even a cursory evaluation of the information submitted to

Magnus Enterprises to purportedly authorize it to access Plaintiff's credit report to issue an auto loan would have revealed that the loan application was fraudulent.

58.    Magnus Enterprises conducted most—if not all—aspects of the fraudulent "sale" remotely.

59.    Magnus Enterprises facilitated the sale using a North Carolina driver's license that was obviously fake due reasons including a photograph evidencing the type of distortion typical of a camera phone "selfie" (i.e., wide features in the center of the face caused by using a camera lens with a short focal length), no "watermarking" texture over the photo, and bold text on the right side of the fraudulent "license" portraying the word "MOSS" (as opposed to Plaintiff's real license, which had "MQ88" in an extremely small font).

60.    The fraudster also listed a fake address for himself and then provided an entirely separate mailing address in the "care of" another person.

61.    Despite this rampant evidence of fraud, Magnus Enterprises illegally accessed Plaintiff's consumer report(s) and then transmitted Plaintiff's information to GM Financial—and likely to other third parties—before GM Financial issued the fraudulent loan based on such consumer report(s). But for Magnus Enterprises' illegal access of Plaintiff's consumer report(s), the fraudulent loan would not have been issued.

62.    After Magnus Enterprises sent Plaintiff's information to GM Financial and GM Financial issued the fraudulent loan, GM Financial repeatedly obtained Plaintiff's consumer report(s) with no permissible purpose to do so.

63.    GM Financial illegally accessed Plaintiff's consumer report(s) on multiple occasions, including (but not limited to) September 1, 2023, September 3, 2023, and September 12, 2023.

64.    But for Magnus Enterprises providing GM Financial with Plaintiff's personal information, GM Financial would never have accessed Plaintiff's credit in connection with the Fraudulent GM Loan.

65.    GM Financial used information from one or more illegally obtained consumer report(s) regarding Plaintiff to further its illegal collection activity.

*Plaintiff Suffered Actual Harm*

66.    Magnus Enterprises facilitated issuance of the fraudulent loan based on an illegally obtained consumer report regarding Plaintiff.

67.    GM Financial then continued to report the fraudulent information to Equifax, Experian, and Trans Union, despite being notified that this information was false.

68.    Plaintiff's credit was harmed by GM Financial's issuance of the fraudulent loan based on an illegally obtained consumer report regarding Plaintiff, created due to information it received from Magnus Enterprises.

69.    Plaintiff attempted to resolve these matters with Magnus Enterprises and GM Financial and her credit was harmed by GM Financial's failure to correct its inaccurate reporting.

70.    As a result of Magnus Enterprises's violations of the FCRA, Plaintiff has suffered damages, including but not limited to:

    a.  Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

    b.  Monies lost by needing to purchase a subscription with FICO to monitor her credit;

    c.  Harm to Plaintiff's credit opportunities;

    d.  Fear of being denied credit;

e. Apprehension in applying for new credit or housing;

f. Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

g. Loss of time attempting to correct the inaccuracies;

h. Stress associated with attempting to resolve this matter;

i. Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: depression and anxiety, crying spells, loss of appetite, irritability, sleep loss, harm to relationships, feelings of fear, difficulty concentrating, harm to job performance, harm to reputation, and loss of privacy. Plaintiff has also incurred medical expenses and experienced the need to take medications as a result of Defendants' actions and inactions.

### *Defendant's Conduct Was Willful*

71. The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

72. No records or knowledge of Magnus Enterprises provided it with a basis to certify a permissible purpose to any consumer reporting agency to obtain consumer report(s) regarding Plaintiff. In fact, all records or knowledge possessed by Magnus Enterprises suggested there was no permissible purpose to access Plaintiff's consumer report(s).

73. The FCRA's permissible purpose requirements have been in place since 1970. Magnus Enterprises has therefore had decades to become compliant.

74.     Magnus Enterprises lacks adequate procedures to ensure that its employees and agents comply with Section 1681b(f) of the FCRA.

75.     Magnus Enterprises also has access to court decisions, regulatory advice, and multiple other sources of guidance to advise it of the requirements of the FCRA.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of § 1681b(f) of the FCRA

76.     Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

77.     Magnus Enterprises repeatedly violated 15 U.S.C. § 1681b(f) by unlawfully obtaining Plaintiff's consumer reports without her written authorization or a permissible purpose.

78.     Magnus Enterprises also violated 15 U.S.C. § 1681b(f) by failing to accurately and lawfully certify a permissible purpose when accessing Plaintiff's consumer report(s).

79.     Plaintiff's consumer report(s) contained a wealth of private information which Magnus Enterprises had no right to access absent a specific Congressional license to do so.

80.     As a result of Magnus Enterprises's conduct, action, and inaction, Plaintiff suffered actual damages, including but not limited to: invasion of her statutory right to confidentiality of her personal information, issuance of a fraudulent auto loan in her name, costs associated with disputing the inaccurate information, costs associated with purchasing credit information from FICO to see what is reporting on her credit, depression and anxiety, crying spells, loss of appetite, irritability, sleep loss, harm to relationships, feelings of fear, difficulty concentrating, harm to job performance, harm to reputation, and loss of privacy. Plaintiff has also incurred medical expenses and experienced the need to take medications as a result of the Defendant's actions and inactions.

81.     As a result of Magnus Enterprises's violations of 15 U.S.C. § 1681b(f), Plaintiff is entitled to recover actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

82.     Magnus Enterprises's conduct, action and inaction was willful, and it is liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

83.     Plaintiff is entitled to recover costs and attorneys' fees from Magnus Enterprises in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

84.     Plaintiff does not seek joint liability.

## COUNT II
### Invasion of Privacy by Intrusion Upon Seclusion

85.     Plaintiff re-alleges and incorporates all other factual allegations set forth in the Complaint.

86.     Plaintiff sustained damages, including emotional distress and mental anguish.

87.     Magnus Enterprises intentionally intruded upon Plaintiff's solitude and seclusion and believed or was substantially certain that it lacked the necessary legal authority or personal permission, invitation, or valid consent to obtain Plaintiff's credit reports.

88.     Magnus Enterprises's intrusion was of the kind that would be highly offensive to a reasonable person, as the result of conduct to which a reasonable person would strongly object.

89.     Plaintiff conducted herself in a manner consistent with an actual expectation of privacy.

90.     Magnus Enterprises's intrusion was a proximate cause of Plaintiff's damages, including emotional distress and mental anguish.

91.     Plaintiff does not seek joint liability.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)     Award Plaintiff actual and punitive damages for violations of the FCRA by Magnus Enterprises;

(2)     Award Plaintiff attorney's fees and costs under the FCRA;

(3)     Award Plaintiff damages due to Magnus Enterprises' invasion of her privacy;

(4)     Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(5)     Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

Respectfully Submitted,

**MARIAM QASIM**

/s/ *Leonard A. Bennett*
Leonard A. Bennett, NCSB #21576
Mark C. Leffler*
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662- Fax
Email: lenbennett@clalegal.com
Email: mark@clalegal.com

*Counsel for Plaintiff*